UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BARBARAMARIE SUMMERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 1:16-cv-02243-RLY-MPB |
| ) | |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of the Social Security, ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

# REPORT AND RECOMMENDATION ON
# APPROPRIATE DISPOSITION OF THE ACTION

This matter was referred to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a Report and Recommendation as to its appropriate disposition. (Docket No. 29). Plaintiff Barbaramarie Summers seeks judicial review of the Social Security Administration's final decision deeming her ineligible for Supplemental Security Income. The matter is fully briefed. (Docket No. 23; Docket No. 28; Docket No. 30). It is recommended that the District Judge **REMAND** the decision of the Commissioner of the Social Security Administration finding that Plaintiff Barbaramarie Summers is not disabled, pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration, consistent with this opinion.

## Introduction

Barbaramarie Summers applied for Supplemental Security Income under Title XVI of the Social Security Act, alleging disability beginning December 18, 2010. She alleges disability because of seizures, irritable bowel syndrome, and depression. Her application was denied initially and on reconsideration. Ms. Summers requested a hearing. A hearing was held on September 30, 2014, and a supplemental hearing was held on March 10, 2015, both before

administrative law judge (ALJ) Ronald T. Jordan. On April 14, 2015, the ALJ issued a decision, concluding that Ms. Summers is not disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Ms. Summers timely filed this action under 42 U.S.C. § 405(g) for review of that decision.

## **Standard for Proving Disability**

To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Plaintiff is disabled if her impairments are of such severity that she is not able to perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 1382c(a)(3)(B). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 416.920.

Step one asks if the claimant is currently engaged in substantial gainful activity; if she is, then she is not disabled. Step two asks whether the claimant's impairments, singly or in combination, are severe. If they are not, then she is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). The Listings includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so

that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity (RFC) is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations. 20 C.F.R. § 416.920(e). At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled. The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on her vocational profile (age, work experience, and education) and her RFC. If so, then she is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given her vocational profile and RFC. *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 416.960(c).

### **Standard for Review of the ALJ's Decision**

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. This Court must affirm the ALJ's decision unless it lacks the support of substantial evidence or rests upon legal error. *See, e.g.*, *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ—not the Court—holds discretion to weigh evidence, resolve material conflicts, make independent factual

findings, and decide questions of credibility. *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971). Accordingly, the Court may not reevaluate the facts, reweigh evidence, or substitute its judgment for the ALJ's. *See, e.g.*, *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).

The ALJ is required to articulate a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made. And the ALJ must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel*, 227 F.3d 862, 872 (7th Cir. 2000).

## Analysis

I.     **The ALJ's Sequential Findings**

The ALJ found that Ms. Summers had not engaged in substantial gainful activity since the November 6, 2012, the application date. (Docket No. 15-2 at ECF p. 23). At step two, the ALJ determined that she has severe impairments of irritable bowel syndrome, chronic obstructive pulmonary disease, affective disorders, post-traumatic stress disorder, and borderline intellectual functioning. (*Id.*) At step three, he found that Ms. Summers does not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at ECF p. 24).

The ALJ determined that Ms. Summers had the RFC to perform the following work:

> Lift, carry, push or pull 20 lbs. occasionally and 10 lbs. frequently. She can stand and walk 6 hours in an 8-hour day and sit 6 hours. She can occasionally stoop, balance, crouch, kneel, crawl and climb stairs or ramps. She should not climb ladders, scaffolds or ropes and should not work around hazards …. She should … [have certain environmental limitations]. She is limited to work involving simple, repetitive tasks requiring no independent judgment regarding basic work processes; work goals from day to day should be static and predictable; and she should have only occasional, superficial contact with coworkers and the general public.

(Docket No. 15-2 at ECF p. 27).

The ALJ concluded that Ms. Summers had no past relevant work. (Docket No. 15-2 at ECF p. 36). He found that there were a significant number of jobs in the economy that she could still perform. Given Ms. Summers's RFC, age, and education, and based on the testimony of a vocational expert (VE), the ALJ concluded that Ms. Summers would still be able to perform the jobs of housekeeper, merchandise marker, and router. (Docket No. 15-2 at ECF 36-37). Therefore, he decided that she was not disabled.

## II.     Review of Plaintiff's Assertions of Error

### A.  Whether the ALJ Sufficiently Articulated His Listings Analysis

Ms. Summers challenges the ALJ's Listings analysis. She argues that the ALJ failed to consider Listing 12.05 and Listing 12.07. She also contends that the ALJ's analysis of the evidence under Listing 3.03B was erroneous. The Court addresses each argument in turn.

Ms. Summers first argues that the ALJ failed to provide any analysis of Listing 12.05. The Commissioner responds that Ms. Summers has not shown that she meets the Listing, so any error was harmless. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664 (7th Cir. 2004). Despite finding that Ms. Summers has borderline intellectual functioning, the ALJ never identified Listing 12.05 (Intellectual disability) by name. He did not provide an analysis under the listing either.[1]

Listing 12.05 contains: (1) "an introductory paragraph with the diagnostic description for intellectual disability, and (2) four sets of criteria (paragraphs A through D). 20 C.F.R. Pt. 404,

---

[1] The ALJ noted Dr. Sarah McKenna referenced Ms. Summers's "mild intellectual disability" (Docket No. 15-2 ECF p. 33). While the ALJ discussed the psychological evaluation with Dr. J. Mark Dobbs, the ALJ omitted any mention of the IQ score. (Docket No. 15-2 ECF p. 34-35).

5

Subpt. P., App 1, § 12.00.[2] An applicant meets the Listing if her impairment satisfies both the introductory paragraph and any one of the four sets of criteria. *Id.* The introductory paragraph states: "[i]ntellectual disability refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P., App 1, § 12.05. Ms. Summers argues that she meets the requirements of Listing 12.05 because (1) she demonstrated deficits in "adaptive functioning" prior to age twenty-two, namely, she was in Special Education classes throughout high school, and (2) she satisfies subpart C, which requires a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* She points to the Full Scale IQ score of 66 she obtained during her mental status examination with Dr. J. Mark Dobbs and asserts, correctly, that the ALJ found her to have severe, secondary impairments that imposed functional limitations.

The Commissioner responds that the ALJ's failure to consider Listing 12.05 was harmless error because there is no evidence of "listing-level deficits in adaptive functioning." (Docket No. 28 at ECF p. 6). The Commissioner notes that Dr. Dobbs concluded that Ms. Summers's adaptive functioning was in the "borderline range" and that her speed and memory scores were decreased, in part, by her use of anxiolytic medications prior to the examination, and he ultimately diagnosed her with "borderline intellectual functioning." (*Id.*; *see also* Docket No. 15-7 at ECF p. 16). In defending the ALJ's decision on these grounds, which were not relied

---

[2] Although the SSA has changed the Listings for psychological impairments, this was the text of the Listing that applied at all relevant times.

upon by the ALJ, the Commissioner violates the *Chenery* principle.[3] *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943).

The Commissioner does not explain what "listing-level deficits in adaptive functioning" means; nor does she cite any authority to give meaning to the modifier "listing-level." The Listing simply requires "deficits in adaptive functioning"; it seems that any deficits may suffice; the deficits need not rise to a certain level. Further, the SSA has not expounded on the meaning of "deficits in adaptive functioning." However, the Seventh Circuit has explained that "deficits in adaptive functioning" means an "inability to cope with the challenges of ordinary everyday life." *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (citing Am. Psychiatric Ass'n *Diagnostic and Statistical Manual of Mental Disorders ("DSM")*, Text Revision, DSMV-IV-TR 42 (4th ed. 2000)).[4] The evidence suggests that Ms. Summers has an inability to cope with the challenges of ordinary, everyday life. While she may be capable of bathing and changing her clothes daily and she can do laundry (with assistance lifting and carrying), light grocery shopping (again with assistance) and light cooking for herself, and she uses public transportation, she does not do well with money management and she has weak math skills. The latter two capabilities are arguably necessary to cope with ordinary everyday life (for example, to pay bills). Moreover, as Dr. Pella suggested, Ms. Summers's mental impairments cause her to experience physical symptoms such as abdominal pain and her symptoms affect her ability to function. (Docket No. 15-2 at ECF pp.

---

[3] The ALJ did note that Ms. Summers admitted she was "sedated from an anxiolytic" (Docket No. 15-2 at ECF p. 34); Dr. Dobbs' report suggests that this may have lowered her speed and memory scores but does not suggest that it affected her adaptive functioning (Docket No. 15-7 at ECF p. 16).

[4] Under the current version of the *DSM* "deficits in adaptive functioning ... refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 5th Edition, DSM-V 37 (2013) at 37. The criterion for "adaptive functioning" is met when at least one domain is "sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings." *Id.* at 38.

53-54). This is evidence that Ms. Summers is not able to cope with the challenges of ordinary, everyday life; therefore, the ALJ was required to consider Listing 12.05C. Where the evidence reasonably suggests that the plaintiff's condition might meet or equal a listing, the ALJ's failure to consider the listing requires a remand. *Rice v. Barnhart,* 384 F.3d 363, 369–70 (7th Cir. 2004).

Ms. Summers also challenges the ALJ's failure to consider her mental impairments under Listing 12.07 for somatoform disorders. She argues that since the medical expert stated that she should be evaluated under this Listing, the ALJ should have obtained a medical expert in psychology. The Commissioner responds that it is not surprising the ALJ did not credit Dr. Pella's testimony that Ms. Summers should be evaluated under Listing 12.07 because the physician disqualified it. (See Docket No. 15-2 at ECF p. 54 ("I think [Ms. Summers] really should be evaluated according to 12-07A. I'm not a psychiatrist, don't pretend to be, your honor. But my overview of this extensive record and the costs of treatment, it mostly closely resembles that listing.")). The Commissioner argues that Plaintiff's counsel did not suggest additional psychological expert testimony was necessary. She also argues that the Plaintiff's citation to evidence does not establish that Ms. Summers was disabled by her ongoing mental health issues.

The ALJ should have evaluated Ms. Summers's mental impairments under Listing 12.07 and should have obtained a medical expert in psychology to opine on the issue of whether Ms. Summers's mental impairments equaled Listing 12.07.[5] Although the ALJ is responsible for deciding whether a claimant meets or equals a listing, *see* SSR 96-6p, the ALJ must consider

---

[5] During the relevant time period, the required severity level for somatoform disorders was met if the requirements of both paragraph A and B were satisfied. The "paragraph B" criteria are the same criteria found in paragraph B of Listings 12.02, 12.04, and 12.06—all listings that the ALJ considered and found were not satisfied. (Docket No. 15-2 at ECF pp. 24-25). However, Ms. Summers asserts that the ALJ failed to analyze whether she met *or equaled* the listing. Even taking the ALJ's paragraph B criteria findings into account, the evidence raises the question of whether Ms. Summers's mental impairments equal the severity of Listing 12.07.

8

expert opinion evidence on the issue of medical equivalence, *Barnett v. Barnhart*, 381 F.3d 664, 670-71 (7th Cir. 2004).

Certainly, the ALJ was less qualified than the medical expert—an M.D. (Docket No. 15-4 at ECF pp. 86-90)—to evaluate whether further evidence was needed on the question of medical equivalence. Dr. Pella thought that Ms. Summers should be evaluated under Listing 12.07A. And his testimony was supported by Dr. Rutledge's assertion that Ms. Summers's "abdominal symptoms are very unlikely to be related to an active pathologic disease process but to ongoing mental health issues." (Docket No. 16-14 at ECF at p. 25). Although Ms. Summer's counsel did not request during the hearing that the ALJ obtain testimony from a psychological expert, counsel did request a psychological evaluation by a medical expert in his post-hearing brief submitted to the ALJ two days later. Further, the evidence raises the question that Ms. Summer's mental health issues affect her ability to function to the point that she may be unable to sustain work existing in significant numbers in the national economy—the frequency and sheer number of hospital admissions and emergency room visits calls into question whether Ms. Summers could sustain gainful employment. Also, the frequency of Ms. Summer's symptoms of irritable bowel syndrome and need to take frequent bathroom breaks suggest at least great difficulty in the ability to hold a job. (*See* Docket No. 15-13 at ECF pp. 72 and 75).

The Court recognizes that "[t]he signature of a State agency medical or psychological consultant on a Disability Determination and Transmittal (DDT) Form ensures that consideration by a physician or psychologist designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Grant v. Berryhill*, Case No. 1-16-cv-696-SEB-DML, 2017 WL 3099598, at *4 (S.D. Ind. June 29, 2017). The ALJ indicated that he relied on the opinions of the State Disability Determination

Services agency physicians and cites to the Disability Determination Explanation forms (which include assessments by psychologists). However, none of the state agency medical experts identified either Listing 12.05 or 12.07 in their review of the evidence. (*See* Docket No. 15-3 at ECF pp. 5-6 (citing Listings 12.02, 12.04, and 12.06) and 14-15 (same)). Thus, the ALJ did not rely on a medical expert on the question of whether Ms. Summers meets or equals Listing 12.05 or 12.07, which was error.

Ms. Summers challenges the ALJ's analysis of Listing 3.03B for asthma as well. Listing 3.03B required asthma with:

> Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours *for control of asthma* counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

20 C.F.R. Pt. 404 Subpt. P, App. 1 § 3.03(B) (emphasis added).[6] Listing 3.00C defines "attacks of asthma" as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting." 20 C.F.R. Pt. 404 Subpt. P, App. 1 § 3.00C. In arguing she has presented evidence that raises the question of whether she equals this Listing, Ms. Summers asserts she satisfies the frequency of "attacks" that are required. However, she indicates that her impairment is Irritable Bowel Syndrome or alternatively Somatoform Disorder. Thus, she suggests that the "attacks" need not be related to the asthma. She cites no authority to support this creative argument, not in her briefs filed in this Court or in counsel's letter brief to the ALJ on 3.03B equivalence. (See Docket No. 23 at ECF pp. 31; Docket No. 30 at ECF p. 5; Docket No. 15-6 at ECF pp. 45-49). Yet, Listing

---

[6] This was the text of the Listing for asthma applicable at all relevant times.

3.00 pertains to the *respiratory system*. And 3.00C makes no mistake: the "attacks" in question are "[a]ttacks of *asthma*." 20 C.F.R. Pt. 404 Subpt. P, App. 1 § 3.00C (emphasis added). Ms. Summers's argument that the ALJ erred in finding that her impairments do not meet Listing 3.03B is simply unpersuasive.

### B. Whether the ALJ Adequately Addressed Dr. Pella's Opinion

Ms. Summers argues that the ALJ failed to evaluate the portion of Dr. Pella's opinion which supported a more restrictive RFC than the one found by the ALJ, referring to Dr. Pella's questioning of whether a person who repetitively goes to the emergency room and has hospital admissions could sustain employment. She contends that although the ALJ gave "great weight" to Dr. Pella's testimony, the ALJ ignored this finding. (Docket No. 23 at ECF p. 34). Ms. Summers mischaracterizes Dr. Pella's uncertainty as a "finding." Dr. Pella is not a vocational expert (Docket No. 15-2 at 55) and therefore does not have the expertise to opine on whether the frequency with which Ms. Summers seeks and receives medical attention would preclude her from sustaining employment. Such expertise lies with the VE. Ms. Summers's argument that the ALJ failed to account for Dr, Pella's testimony about the vocational effect of frequently seeking medical attention is unpersuasive.

### C. Whether the ALJ's Question to the VE About Work Absences Is Based in the Evidence

Finally, Ms. Summers raises a challenge to the factual basis for the ALJ's questioning of the VE about the vocational effect of her work absences. As noted, the ALJ's determination that Ms. Summers was capable of working was based, in part, on the VE's testimony. At the second hearing, the ALJ asked the VE to assume an individual of Ms. Summers's age and education, with no past relevant work, with the RFC the ALJ found Ms. Summers to have and asked

11

whether such an individual could perform any jobs in the national economy. (Docket No. 15-2 at ECF pp. 59-60). The VE responded that such an individual could perform work as a housekeeper, merchandise marker, and router. (*Id.* at ECF p. 60). Then the ALJ asked the VE to assume an additional limitation: "this individual approximately every two months would have an absence of two to three days for a total of 15 to 18 absences a year." (Docket No. 15-2 at ECF p. 61). The VE responded that with the additional limitation, the individual could maintain employment as a housekeeper but the other two positions were eliminated. (*Id.* (VE stating that 15 to 18 days missed during a year would not be acceptable in the manufacturing realm, which included the router and merchandise marker jobs)). The VE explained that an individual can miss up to two days of work per month in a service-related environment and that the housekeeper job was within such an environment. (*Id.*)

It is unclear to the Court how the ALJ determined that Ms. Summers would be absent no more than two to three times every two months for a total of fifteen to eighteen absences each year. Her medical history suggests that she would have a far greater number of absences. For example, evidence shows that in February 2011, Ms. Summers had a medical evaluation, a five-day inpatient hospital stay, and sought treatment at the emergency room on two occasions (Docket No. 15-8 at ECF pp. 26, 30, 55-56; Docket No. 15-9 at ECF p. 45); in April 2011, she had another five-day inpatient hospital stay (Docket No. 15-8 at ECF p. 21); and in February 2012, she had an endoscopy performed one day, visited the emergency room on two separate dates, and had a three-day inpatient hospital stay (Docket No. 15-9 at ECF pp. 22-23; Docket No. 15-8 at ECF pp. 86-87; Docket No. 15-11 at ECF p. 35). The ALJ acknowledged that Ms. Summers "has a number o[f] ER visits for her alleged pain," (Docket No. 15-2 at ECF p. 24), a "history of hospital visits and admissions" (*id.* at ECF p. 27), and "persistent presentations to the

emergency department, persistent admission, and persistent testing." (Docket No. 15-2 at ECF p. 29). He apparently discounted the frequency of visits that she would require either because the medical findings failed to substantiate her subjective complaints (*id.*), because of alleged drug-seeking behavior (*id.* at ECF pp. 31-32), and/or because he found she "has exaggerated symptoms and limitations." (Docket No. 15-2 at ECF p. 32). However, Dr. Pella testified that drug-seeking behavior was not currently a concern. And the lack of objective medical findings to accompany Ms. Summer's symptoms and any perceived exaggeration of symptoms and limitations raises the question of whether she has a somatoform disorder. But she was not evaluated under the Listing for somatoform disorders. In any event, it is unclear how the ALJ decided that approximately every two months Ms. Summers would be absent from work only two to three days for a total of 15 to 18 absences a year. An ALJ must build an accurate and logical bridge from the evidence to his conclusions. *Curvin v*. Colvin, 778 F.3d 645, 648 (7th Cir. 2015). Such a bridge is lacking here with regard to Ms. Summers's absences from work.

## Conclusion

For all these reasons, the Magistrate Judge recommends that the Court remand this case pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration, consistent with this opinion.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1). Failure to file timely objections within fourteen days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure. The parties should not expect any extensions of time within which to file objections.

**SO RECOMMENDED** the 2nd day of August, 2017.

_____
Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system